**UNITED STATES of America, Appellee,**

v.

**Anthony SALERNO and Vincent Cafaro, Defendants-Appellants.**

**Nos. 1386, 1387, Dockets 86–1197, 86–1198.**

United States Court of Appeals, Second Circuit.

Argued May 29, 1986.

Decided July 3, 1986.

Alan M. Cohen, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty. for the Southern Dist. of N.Y., Mark R. Hellerer, Warren Neil Eggleston, Asst. U.S. Attys., New York City, on brief), for appellee.

Anthony M. Cardinale, Boston, Mass. (Roy Cohn, New York City, on brief), for defendant-appellant Salerno.

Steven K. Frankel, New York City, for defendant-appellant Cafaro.

Before FEINBERG, Chief Judge, NEWMAN and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Anthony Salerno and Vincent Cafaro appeal from orders of the United States District Court for the Southern District of New York, 631 F.Supp. 1364, committing them to the custody of the Attorney General for pretrial detention pursuant to the Bail Reform Act of 1984 (the "Bail Reform Act" or "Act"), 18 U.S.C. §§ 3141–3156 (Supp. II 1984), on the ground that no condition or combination of conditions of their release will reasonably assure the safety of any other person and the community. On appeal, defendants raise statutory and constitutional challenges to their continued confinement. We find no merit in their statutory arguments but agree that to the extent that § 3142(e) of the Act permits their pretrial detention on the stated ground, that section violates the Due Process Clause of the Constitution of the United States. We therefore vacate the orders of the district court, remand for the setting of conditions of bail, and stay the issuance of the mandate until the mandate of this Court is issued in *United States v. Melendez-Carrion*, 790 F.2d 984 (2d Cir.1986).

## I. BACKGROUND

Salerno and Cafaro were arrested on March 21, 1986, and have been incarcerated since that date. They were charged, along with 13 others, in a 29-count indictment with one count of conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), in violation of 18 U.S.C. § 1962(d) (1982); one count of participating in a racketeering enterprise, in violation of 18 U.S.C. § 1962(c) (1982); 16 counts of mail fraud, in violation of 18 U.S.C. § 1341 (1982); one count of wire fraud, in violation of 18 U.S.C. § 1343 (1982); eight counts of extortion, in violation of 18 U.S.C. § 1951 (1982); and one count of operating an illegal bookmaking business and one count of operating an illegal numbers business, in violation of 18 U.S.C. § 1955 (1982). The RICO counts allege 35 specific acts of racketeering activity, including the alleged mail and wire frauds, extortion, and gambling, and two conspiracies to commit murder.

### A. The Initial Decision by Judge Walker

At the arraignment of Salerno and Cafaro before Judge John M. Walker, Jr., sitting as Part I Judge, the government moved for their pretrial detention pursuant to 18 U.S.C. § 3142(e). The government conceded that neither defendant posed a risk of flight, but it contended that no condition of bail or combination of conditions would assure the safety of the community or any person. After a three-day continuance at the request of the government, Judge Walker conducted an evidentiary hearing.

At the hearing, the government submitted to the court a lengthy and detailed proffer of evidence derived from court-ordered electronic surveillance at various locations and from the anticipated testimony of two of the government's trial witnesses. The proffer indicated that Salerno was the "boss" of the Genovese Crime Family of La Cosa Nostra, that Cafaro was a "captain" in the Genovese Family, and that the two had participated in conspiracies to use violence in seeking to, *inter alia*, eliminate competition for their gambling operations, collect moneys in the course of their loan-sharking business, and control labor unions. The proffer also indicated that the expected testimony of the two witnesses, former high-ranking members of organized

crime who had testified for the government at trials of other organized crime figures, would show Salerno's participation in conspiracies to murder two named individuals. Tapes of electronic surveillance also disclosed Salerno's approval of at least one other plan to commit murder.

Salerno, in opposition to the motion for detention, suggested that the government's key witnesses were subject to impeachment on the basis of their criminal pasts and their favorable cooperation agreements with the government, and he proffered the testimony of witnesses who, while denying knowledge relating to any of the allegations in the indictment, would state that they did not consider Salerno to be any danger to the community. Salerno also produced a letter from his doctor, who had attended him since 1977, stating that Salerno, age 74, has had a history of high blood pressure complicated by congestive heart failure since 1961 and that his condition has resulted in serious vascular damage which, despite a strict medical regimen, has progressed. The doctor noted also that in 1981 Salerno suffered a stroke from which he has recovered with some limited residual disability.

Cafaro presented no evidentiary material at the hearing. He relied on argument that the government's tape recordings of his threats of violence and counseling of others to use violence revealed at most "tough talk" and that the government had offered no proof that any of the violent acts discussed by him were actually carried out.

After the two-day hearing, the court granted the government's motion for detention in an Opinion and Order dated March 28, 1986 ("March 28 Order"), which apparently was not filed but was modified by an Opinion and Order filed on April 2, 1986 ("April 2 Opinion"). In the April 2 Opinion, the court reviewed in detail the government's proffer with respect to the defendants' use or threatened use of violence and concluded that the government had established by clear and convincing evidence that no condition or combination of conditions of release would ensure the safety of the community or any person in the community. As to Salerno, the court noted, *inter alia,* that

> [t]he government has proffered information showing that Salerno could order a murder merely by voicing his assent with the single word "hit." Although some of these murder conspiracies occurred between six and ten years ago, their seriousness and the ease with which they could be ordered weigh heavily in favor of finding that Salerno is a present danger to the community.

April 2 Opinion at 1371. The court noted that the release conditions proposed by Salerno, which included so-called "house arrest" and an order not to commit crimes or intimidate witnesses, closely paralleled those found inadequate in *United States v. Colombo,* 777 F.2d 96 (2d Cir.1985), and it concluded that Salerno should remain detained pending trial.

As to Cafaro, the court found that the government had "established by clear and convincing evidence that Cafaro was actually conducting the business of the enterprise and that he did so by directing others to commit violent acts." April 2 Opinion at 1375. The court concluded that the release conditions proposed by Cafaro, which were that he surrender his passport and not be allowed to go to specified restaurants, social clubs, and offices, or to associate with other defendants, would at most assure Cafaro's presence at trial but would in no way assure the safety of the community:

> The activities of a criminal organization such as the Genovese Family do not cease with the arrest of its principals and their release on even the most stringent of bail conditions. The illegal businesses, in place for many years, require constant attention and protection, or they will fail. Under these circumstances, this court recognizes a strong incentive on the part of its leadership to continue business as usual. When business as usual involves threats, beatings, and murder, the present danger such people pose in the community is self-evident.

*Id.* at 1375. The court stated that "this court cannot envision any set of conditions that could ensure the safety of the community from Cafaro." *Id.* at 1375.

Accordingly, the court ordered that Salerno and Cafaro be committed to the custody of the Attorney General for confinement prior to trial. To the extent practicable, defendants were to be confined in a corrections facility separate from persons awaiting or serving sentences or being held in custody pending appeal, and were to be afforded reasonable opportunity for private consultation with their respective attorneys.

### B. *The Decision by Judge Lowe*

While the government's motion was pending before Judge Walker as Part I judge, the present prosecution was assigned by lot to Judge Mary Johnson Lowe for trial. On April 1 defendants asked Judge Lowe to review the March 28 detention order announced by Judge Walker and thereafter made a more formal motion for review of both the March 28 Order and the final detention order embodied in the April 2 Opinion. Following a hearing on April 11, Judge Lowe denied defendants' motion. She ruled that Judge Walker's findings were not subject to *de novo* review and that there was no new evidence sufficient to warrant disturbing those rulings.

Defendants have filed notices of appeal seeking review of the orders of Judges Walker and Lowe.

### C. *Issues on Appeal*

Defendants raise several issues on appeal. Salerno contends that the government's reliance on the fruits of electronic surveillance without giving him 10 days' notice violated the provisions of 18 U.S.C. § 2518(9) (1982). Both defendants contend that the evidence was insufficient under the standards set by 18 U.S.C. § 3142(f) to support the district court's findings, and that to the extent that § 3142(e) of the Bail Reform Act permits their pretrial detention solely on the ground that they are likely to commit further crimes against the commu-

nity, the Act violates their right to due process. The government contends that to the extent that defendants seek review of Judge Walker's March 28 Order, the notices of appeal were not timely filed, and this Court thus lacks jurisdiction to review that order.

We conclude that Judge Walker's detention order is properly before us and we thus reject the government's jurisdictional argument. We also reject defendants' statutory contentions, but we find merit in their constitutional attack on § 3142(e) of the Bail Reform Act in the present circumstances.

### II. JURISDICTION

■ The government challenges our jurisdiction to review Judge Walker's March 28 Order on the ground that defendants' notices of appeal were not filed until April 21, 1986. Rule 4(b) of the Federal Rules of Appellate Procedure provides that

[i]n a criminal case the notice of appeal by a defendant shall be filed in the district court within 10 days after the entry of the judgment or order appealed from.... A judgment or order is entered within the meaning of this subdivision when it is entered in the criminal docket.

Notwithstanding a welter of confusing dates, it appears that, given the sequence of events below, defendants' notices of appeal were timely filed.

First, although the notices of appeal list the March 28 Order as among those of which review is sought, that order was never entered in the court's criminal docket. Instead, it apparently was superseded by the order dated April 2, 1986, which was embodied in the April 2 Opinion. The April 2 Opinion was entered in the criminal docket on April 7. Thus the 10-day appeal period began on April 7.

Second, although defendants' notices of appeal bear the typed and handwritten date April 21, 1986, and were not docketed until April 23, the notices are officially stamped as having been filed in the Southern Dis-

trict Clerk's Office on April 16, 1986. The docket entries also state that the notices of appeal were filed on April 16. Thus, it appears that the notices were filed within the 10-day period after the docketing of Judge Walker's final detention order. They are timely to give us jurisdiction to review that order.

## III. STATUTORY ISSUES

Defendants contend that the detention order was entered in violation of various statutory provisions. We have considered all of defendants' statutory arguments and conclude that none of them has merit. Only two warrant discussion: (1) that the court should have rejected the government's proffer against Salerno of an electronically intercepted conversation because the government had failed to provide him, in advance of the detention hearing, with certain surveillance information pursuant to 18 U.S.C. § 2518(9); and (2) that the evidence was insufficient to support the court's finding pursuant to 18 U.S.C. § 3142 that they pose a danger to the community.

### A. *The Intercepted Conversation*

█ Part of the government's proof against Salerno was its proffer of a recording of a conversation in a construction trailer in Edgewater, New Jersey, obtained through a court-ordered electronic surveillance ("Edgewater surveillance"). Section 2518(9) of Title 18 provides that

> [t]he contents of any wire or oral communication intercepted pursuant to this chapter or evidence derived therefrom shall not be received in evidence or otherwise disclosed in any trial, hearing, or other proceeding in a Federal or State court unless each party, not less than ten days before the trial, hearing, or proceeding, has been furnished with a copy of the court order, and accompanying application, under which the interception was authorized or approved. This ten-day period may be waived by the judge if he finds that it was not possible to furnish the party with the above information ten

days before the trial, hearing, or proceeding and that the party will not be prejudiced by the delay in receiving such information.

Salerno argues that because the government failed to provide him with the Edgewater surveillance application and order 10 days before the detention hearing, the court should have rejected the government's proffer of the contents of the intercepted conversation. We disagree.

Preliminarily, however, we note our disagreement with the government's primary argument as to why we should reject Salerno's contention. The government argues that § 2518(9) has no applicability to detention hearings under the Bail Reform Act because, in light of the Act's provision that such a hearing should be held not later than five days after a defendant's first appearance before a judicial officer, *see* 18 U.S.C. § 3142(f), compliance with § 2518(9) prior to such a hearing would be impossible. We think it clear that Congress intended § 2518(9) to apply to detention hearings, and we do not find the two provisions irreconcilable. On its face, the language used by Congress—"any trial, hearing, or other proceeding in a Federal or State court"—plainly seems broad enough to include a hearing on a pretrial detention motion. Further, the legislative history of § 2518(9) states that the term " '[p]roceeding' is intended to include all adversary type hearings." S.Rep. No. 1097, 90th Cong., 2d Sess. 105, *reprinted in* 1968 U.S. Code Cong. & Admin.News 2112, 2195 ("Senate Report"). We have no doubt that Congress views a detention hearing as an adversary type hearing. It provided in the Bail Reform Act that at such a hearing a defendant is entitled, *inter alia,* to be represented by counsel, to have counsel appointed for him if he is indigent, and to "be afforded an opportunity to testify, to present witnesses on his own behalf, to cross-examine witnesses who appear at the hearing, and to present information by proffer or otherwise." 18 U.S.C. § 3142(f). Thus we conclude that Bail Reform Act

detention hearings are proceedings to which § 2518(9) was intended to apply.

This intention is not vitiated by the fact that § 3142(f) schedules a defendant's initial detention hearing to be held before the 10-day period would normally expire. Appropriate means of coordinating the two sections to achieve the purposes of each are found in the terms of the sections themselves. Thus, § 2518(9) authorizes the judge to waive the 10-day period if he finds that it was not possible for the government to furnish the defendant with the required information so far in advance of the proceedings and that the defendant will not be prejudiced by the delay. And § 3142(f) allows the court, in scheduling the detention hearing, to grant a continuance of longer than the normal maximum length (five days on defendant's motion, three days on the government's motion) for good cause, which would presumably include prejudice to the defendant resulting from the government's inability to have provided him earlier with the surveillance order and application.

■ Nonetheless, we find no violation of § 2518(9) here. The purpose of that section's 10-day provision is "to afford the defendant 'an opportunity to make a pretrial motion to suppress....'" *United States v. Melendez-Carrion,* 790 F.2d at 994 (quoting Senate Report at 105–06, 1968 U.S.Code Cong. & Admin.News at 2195). Such a motion may be made, however, only by an "aggrieved person," § 2518(10)(a), *i.e.,* "a person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed," § 2510(11). A person who was not named in the wiretap order and was not a party to any conversation intercepted during that tap is not an "aggrieved person" and may not move to suppress information derived from it. *United States v. Fury,* 554 F.2d 522, 525–26 (2d Cir.), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977); *see Alderman v. United States,* 394 U.S. 165, 175 & n. 9, 89 S.Ct. 961, 968 & n. 9, 22 L.Ed.2d 176 (1969) ("aggrieved person" language adopted existing standing rule that Fourth Amendment rights may not be asserted vicariously).

As the district court found, Salerno was not named in the Edgewater surveillance order and was not a party to the intercepted conversation. Accordingly, he had no standing to seek its suppression and was not prejudiced by the government's inability to provide him with the surveillance application and order 10 days prior to the detention hearing.

B. *Sufficiency of the Evidence*

■ The Bail Reform Act authorizes detention pending trial where "no condition or combination of conditions will reasonably assure ... the safety of any other person and the community...." 18 U.S.C. § 3142(e). The burden is on the government to prove that pretrial release of the defendant will pose a danger to any person or the community, and it must prove the facts underlying this contention by clear and convincing evidence. 18 U.S.C. § 3142(f); *United States v. Chimurenga,* 760 F.2d 400, 405 (2d Cir.1985).

■ The district court's conclusion that the defendant poses a danger to the community, as well as its ultimate determination that only confinement will assure the safety of other persons and the community, normally must be upheld if not clearly erroneous. *United States v. Gotti,* 794 F.2d 773, 778–779 & n. 4 (2d Cir.1986); *Melendez-Carrion,* 790 F.2d at 994; *Colombo,* 777 F.2d at 100. Where, as in this case, the future misconduct that is anticipated concerns violent criminal activity, no issue arises concerning the outer limits of the meaning of "danger to the community," an issue that would require a legal interpretation of the applicable standard.

■ Within this framework we find no basis for overturning the district court's findings or conclusions. The evidence proffered by the government, as set forth above, amply supported the court's findings that the government had proven by

clear and convincing evidence that Salerno "is a danger to the community as the 'Boss' of an organization that uses force, violence, and threats of force and violence to further its illegal operations," April 2 Opinion at 1371, and that Cafaro "has directed violent acts and is ready, willing and able to direct violent acts in the future," *id.* at 1374.

Nor do we see any error in the district court's application of the terms of the Bail Reform Act to the facts found and its conclusion that the conditions of release proposed by the defendants were inadequate to prevent defendants from resuming the conduct of "business as usual." The conditions proposed by Salerno were not significantly different from those this Court found inadequate in *United States v. Colombo*, 777 F.2d 96; and the conditions proposed by Cafaro would have been substantially less effective.

We conclude that the detention order did not violate the Bail Reform Act.

## IV. THE CONSTITUTIONAL ISSUE

■ Defendants' principal constitutional contention is that the Bail Reform Act violates due process insofar as § 3142(e) permits pretrial detention of a defendant on the ground that his release would pose a danger to the community or any person. We agree. The government makes no claim that pretrial detention may be upheld as a punishment. Detention could not be imposed as punishment in the absence of an adjudication of guilt. *See Bell v. Wolfish*, 441 U.S. 520, 535–37, 99 S.Ct. 1861, 1871–73, 60 L.Ed.2d 447 (1979). Instead the government contends that pretrial detention on the ground of dangerousness may be constitutionally imposed as a regulatory measure to protect public safety. In *United States v. Melendez-Carrion*, a majority of the panel held § 3142(e) unconstitutional as applied to two defendants detained before trial for a period in excess of eight months on the ground of danger to the community. The panel majority was internally divided, however, with Judge Newman holding that danger to the community may not constitutionally justify pre-

trial detention as a regulatory measure and Chief Judge Feinberg holding that such detention had become unconstitutional punishment because of the length of the detention that had occurred. In the present case, a majority of the panel is in agreement that the Due Process Clause prohibits pretrial detention on the ground of danger to the community as a regulatory measure, without regard to the duration of the detention.

At the outset we note that the present detention order does not hinge on risk of flight or threats to potential witnesses, jurors, or others involved in the judicial process. The government conceded at the detention hearing that there was no risk that the defendants would flee and not appear for trial. Nor was there any finding by the court that the defendants were likely to tamper with or intimidate witnesses or jurors, or otherwise to jeopardize the trial process. We recognize that pretrial detention may be validly imposed when substantial evidence indicates that a defendant, if released, would commit such acts. *See Melendez-Carrion*, 790 F.2d at 1002 (Newman, *J.*) ("Pretrial detention to avoid undue risks of flight or jeopardy to the trial process [is] not prohibited by a constitutional scheme that relies on the trial process to determine guilt and enforce the criminal law."); *cf. United States v. Gotti*, 794 F.2d 773 (2d Cir.1986) (defendant's release may be revoked pursuant to § 3148 of the Act if it is established by a preponderance of the evidence that no conditions of release would likely prevent defendant's intimidation of witnesses).

■ The sole bases for the detention order in this case are the findings that the defendants would, if released, carry on "business as usual" notwithstanding any release conditions, and that business as usual involves threats and crimes of violence. April 2 Opinion at 1371, 1375. We regard § 3142(e)'s authorization of pretrial detention on this ground as repugnant to the concept of substantive due process, which we believe prohibits the total deprivation of liberty simply as a means of

preventing future crimes. As Judge Newman elaborated in *Melendez-Carrion:*

> The Government contends that section 3142(e) is to be upheld simply because preventive detention is a rational means of advancing the compelling state interest in public safety. That cannot be the test for determining the constitutionality of preventive detention. The fallacy of using such a test can be readily seen from consideration of preventive detention as applied to persons not arrested for any offense. *It cannot seriously be maintained that under our Constitution the Government could jail people not accused of any crime simply because they were thought likely to commit crimes in the future.* Yet such a police state approach would undoubtedly be a rational means of advancing the compelling state interest in public safety. In a constitutional system where liberty is protected both substantively and procedurally by the limitations of the Due Process Clause, a total deprivation of liberty cannot validly be accomplished [on the sole ground that] doing so is a rational means of regulating to promote even a substantial government interest.
>
> Incarcerating dangerous persons not accused of any crime would exceed due process limits not simply for lack of procedural protections. Even if a statute provided that a person could be incarcerated for dangerousness only after a jury was persuaded that his dangerousness had been established beyond a reasonable doubt at a trial surrounded with all of the procedural guarantees applicable to determinations of guilt, the statute could not be upheld, no matter how brief the period of detention. It would be constitutionally infirm, not for lack of procedural due process, but because *the total deprivation of liberty as a means of preventing future crime exceeds the substantive limitations of the Due Process Clause.* This means of promoting public safety would be beyond the constitutional pale. The system of criminal justice contemplated by the Due Process Clause—indeed, by all of the criminal justice guarantees of the Bill of Rights—is a system of announcing in statutes of adequate clarity what conduct is prohibited and then invoking the penalties of the law against those who have committed crimes. *The liberty protected under that system is premised on the accountability of free men and women for what they have done, not for what they may do. The Due Process Clause reflects the constitutional imperative that incarceration to protect society from criminals may be accomplished only as punishment of those convicted for past crimes and not as regulation of those feared likely to commit future crimes.*
>
> ... As a matter of probabilities, a person lawfully arrested may pose a greater danger than someone not arrested but only suspected of dangerousness, but is very likely less of a risk to the community than many who have been convicted, sentenced, and released from confinement after expiration of their sentences. Just as the Due Process Clause would prohibit incarcerating a person not even accused of a crime in order to prevent his future crimes, it would equally bar preventive detention of a person who has been convicted of past crimes and has served his sentence. The Clause must accord similar protection to a person not convicted but only accused of a crime. Moreover, if the arrest is thought to reflect that the person is more deserving of confinement than members of the public not accused of crime, the confinement would offend the procedural component of due process by dispensing with the procedural guarantees of the Fifth and Sixth Amendments that must be observed before past conduct may justify incarceration on grounds of dangerousness.

790 F.2d at 1000–01 (Newman, *J.*) (emphasis added; footnote omitted).

 In sum, if a person is not charged with a crime, he may not, consistent with principles of due process, be incarcerated simply on the ground that he is likely to commit a crime. The lodging of charges

for alleged past crimes does not alter this concept of due process. The proper remedy for charges of past crimes, assuming they are proven, is payment of the penalty provided by law for those crimes, and we note that a person who has paid this penalty stands in a similar position, vis-a-vis the Bail Reform Act, to one who has not been charged with a crime. Notwithstanding the rehabilitative aspirations of criminal sentencing, however, it must be recognized that there is a substantial amount of recidivism by those who have served their sentences. Yet, once a person has paid the penalty for crimes of which he has been found guilty, he may not be further incarcerated to protect the public. Thus, even the probability that a convicted criminal will again engage in crime does not sanction his incarceration simply in anticipation of such future crimes. His incarceration as a regulatory measure would be barred, not by the Double Jeopardy Clause, which does not apply to nonpunitive measures, *see Helvering v. Mitchell*, 303 U.S. 391, 398–99, 58 S.Ct. 630, 632–33, 82 L.Ed. 917 (1938), but by the substantive component of the Due Process Clause.

To uphold § 3142(e)'s provision for pretrial detention on the ground that defendants charged with violent criminal activities will continue "business as usual" would, therefore, create the anomaly that a person who has been charged with crimes but not yet convicted may be incarcerated on the ground that he will commit crimes in the future, whereas persons who have been neither charged with nor convicted of crimes, or have served their sentence of conviction on those charges, may not be incarcerated on the basis of such a prediction.

We reject the government's contention that the fact of arrest, even for serious crimes, justifies detention of the defendants as a regulatory measure simply because they are likely to continue their criminal activities. As stated in Judge Newman's opinion in *Melendez-Carrion*,

> [t]here can be no doubt that an arrest permits some regulatory curtailment of

liberty. Even before probable cause has been found by a neutral magistrate, "a policeman's on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of crime, and for a brief period of detention to take the administrative steps incident to arrest." *Gerstein v. Pugh*, 420 U.S. 103, 113–14 [95 S.Ct. 854, 863, 43 L.Ed.2d 54] (1975). In addition, a seizure "reasonable" under the Fourth Amendment permits detention until a determination of probable cause by a judicial officer "promptly after arrest." *Id.* at 125 [95 S.Ct. at 868]. Furthermore, the Constitution's scheme for a system of criminal justice specifies that arrest is to be followed by trial and plainly implies that reasonable steps may be taken to ensure that the trial will take place. Procedures may therefore be used both to secure the defendant's presence at trial and to prevent the defendant from aborting the trial by intimidating witnesses or physically harming them.... Pretrial detention to avoid undue risks of flight or jeopardy to the trial process [is] not prohibited by a constitutional scheme that relies on the trial process to determine guilt and enforce the criminal law.

Pretrial detention to prevent future crimes against society at large, however, is not justified by any concern for holding a trial on the charges for which a defendant has been arrested. It is simply a means of providing protection against the risk that society's laws will be broken. Even if the highest value is accorded to that objective, it is one that may not be achieved under our constitutional system by incarcerating those thought likely to commit crimes in the future. Detention of a person lawfully arrested for past criminal conduct is unconstitutional not because preventing crime is less important than preventing a defendant's flight, but because this means of preventing crime conflicts with fundamental principles of our constitutional system of criminal justice, while detention to prevent flight serves the principles of that system by guarantee-

ing that the defendant will stand trial and, if convicted, face punishment.

Permitting an arrested person thought to be dangerous to remain at liberty unquestionably incurs a risk. The prediction of dangerous conduct, however difficult to make and however unreliable, will undoubtedly be correct in some instances. But all guarantees of liberty entail risks, and under our Constitution those guarantees may not be abolished [on the sole ground that] government prefers that a risk not be taken.

790 F.2d at 1001–03 (Newman, *J.*) (footnotes omitted). Even the risk of some serious crime, such as destruction of an airliner, as adverted to in Chief Judge Feinberg's dissenting opinion, *post*, must, under our Constitution, be guarded against by surveillance of the suspect and prompt trial on any pending charges, and not by incarceration simply because untested evidence indicates probable cause to believe he has committed one crime and is a risk to commit another one. Surveillance would doubtless be the government's response if confidential information, not disclosable to obtain an indictment, alerted the government to such a risk by a person not charged with a crime. It should be no less effective in cases where an indictment has been returned, even assuming, which is unlikely, that a person posing such a risk would not be detained despite a well-grounded fear that he would flee.

We do not believe that *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), upholds pretrial detention to guard against the commission of future crimes. The detention there allowed, upon a policeman's assessment of probable cause, was for the purpose of taking "the administrative steps incident to arrest." *Id.* at 114, 95 S.Ct. at 863. The Court's statement that the defendant will not escape "or commit further crimes" during that brief period of detention was not said to provide a reason for continuing the detention; rather it was said to show that there was no reason for dispensing with the requirement that the police submit their evidence of probable cause to a neutral magistrate.

*Id.* It would be somewhat ironic if a decision rendered to assure a suspect the protection of a neutral magistrate's determination of probable cause after "a brief period of detention to take the administrative steps incident to arrest" became the basis for extending that detention for weeks and months after the probable cause determination has been made.

Nor do we believe that the Supreme Court's decision in *Schall v. Martin*, 467 U.S. 253, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984), upholding brief preventive detention of juveniles, disposes of the due process objection to preventive detention of adults. Though the governmental interest in protecting the public is obviously of a high order whether the danger is posed by juveniles or adults, the Court in *Schall* was at pains to point out that juveniles, who "unlike adults, are always in some form of custody," *id.* at 265, 104 S.Ct. at 2410, have an interest in liberty less substantial than that of adults, an interest that "may, in appropriate circumstances, be subordinated to the State's '*parens patriae* interest in preserving and promoting the welfare of the child.'" *Id.* (quoting *Santosky v. Kramer*, 455 U.S. 745, 766, 102 S.Ct. 1388, 1401, 71 L.Ed.2d 599 (1982)).

We have considered the opinions of other appellate courts that have upheld the constitutionality of pretrial detention on the ground of dangerousness and we disagree with them for the reasons stated by Judge Newman in *Melendez-Carrion*. *See* 790 F.2d at 1003–04 (Newman, *J.*). Nor do we believe that the decision of the Supreme Court in *Korematsu v. United States*, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944), authorizes the abandonment of the fundamental principle that detention simply to deter the commission of crime can properly occur only after conviction.

We emphasize again that there has been no finding in the present case that defendants pose a danger to witnesses or to the judicial process. The finding is that they will, if released, conduct business as usual. For the reasons above, we conclude that to

the extent that § 3142(e) of the Bail Reform Act authorizes detention on this ground, it is unconstitutional.

## CONCLUSION

The orders appealed from are vacated, and the matter is remanded to the district court for the setting of conditions of bail. All members of the panel are in agreement that the mandate is hereby stayed until the mandate of this Court is issued in *United States v. Melendez-Carrion.*

FEINBERG, Chief Judge, dissenting:

In this case, we confront the question whether the government may detain a dangerous defendant before trial in order to protect society. The majority believes that the Due Process Clause of the Fifth Amendment prevents the government from detaining such a defendant for that reason for even a brief period of time—presumably even for a day. As will be seen below, I disagree. I believe that pretrial detention for dangerousness does not violate the Due Process Clause when there is clear and convincing proof that a person already under indictment for a serious crime would commit another crime if released, if the detention has not continued so long as to constitute punishment. I would affirm the judgment of the district court, and I respectfully dissent from that portion of the majority opinion that holds the Bail Reform Act unconstitutional.

## I. Is the Bail Reform Act Facially Consistent With Substantive Due Process?

The Bail Reform Act of 1984, 18 U.S.C. § 3141 et seq., permits the government to move before trial for the detention of a defendant indicted for the serious crimes with which appellants are charged, on the grounds that the defendant poses a threat to the safety of the community. 18 U.S.C. § 3142(f). Following a hearing, the judicial officer must order the detention if the officer finds that no conditions of release short of confinement will avert this threat. 18 U.S.C. § 3142(e).

We recently considered this aspect of the Bail Reform Act in *United States v. Melendez-Carrion,* 790 F.2d 984 (2d Cir.1986).

As both Judge Newman's opinion and my concurring opinion in that case point out, at 998, 1006, this statutory scheme has serious constitutional implications. Mentally competent adults not convicted of crime obviously have a substantial liberty interest in remaining free of confinement. Pretrial detention for dangerousness curtails that interest in an untraditional manner. But the novelty of the statute does not determine its lawfulness on its face. Rather, the relevant question is whether detention for a brief period to prevent future crimes while on release comports with the fundamental fairness demanded by the substantive component of the Due Process Clause.

Congress enacted the preventive detention provisions of the Bail Reform Act out of a deep concern about "the growing problem of crimes committed by persons on release." S.Rep. No. 225, 98th Cong., 2d Sess. 6 (1983), reprinted in 1984 U.S.Code Cong. & Admin.News at 3182, 3188–89; see *United States v. Rodriguez,* 794 F.2d 24, 26–27 (2d Cir.1986). Congress concluded that, at least as to "a small but identifiable group of particularly dangerous defendants," the pressing need to protect the community called for confinement before trial. Senate Report, supra, at 6–7, 1984 U.S.Code Cong. & Admin.News at 3188, 3189. In *Bell v. Wolfish,* 441 U.S. 520, 534 n. 15, 99 S.Ct. 1861, 1871 n. 15, 60 L.Ed.2d 447 (1979), the Supreme Court reserved the question whether such an objective could constitutionally justify pretrial detention. In *Schall v. Martin,* 467 U.S. 253, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984), the Court settled the issue with respect to juvenile detainees. The Court rejected a due process challenge to New York's scheme of detaining for a period generally not exceeding 17 days juveniles charged with crime in order to prevent them from committing crimes while on release. The Court held that the system was compatible with substantive due process because detention based on dangerousness served a "legitimate and compelling" goal and did not amount to "punishment." Id. at 264–75, 104 S.Ct. at 2409–16.

It is true that *Schall* concerned detention of juveniles, whose liberty interest in freedom from confinement while charges are pending against them may be inferior to that of adults in a similar position. Id. at 265, 104 S.Ct. at 2410. However, the societal interest identified as "compelling" by the Court only two years ago in *Schall* does not vary in strength with the age of the person to be detained. If anything, the need to shield the community from the hazards of pretrial crimes committed by adults is more compelling, since adults may have superior access to the means of committing more serious and far-reaching offenses. Accordingly, the government has advanced a legitimate and compelling reason for pretrial confinement of adults accused of crime. In light of this reason it is not surprising that other circuit courts that have considered the issue have held this aspect of the Bail Reform Act constitutional on its face. *United States v. Portes*, 786 F.2d 758 (7th Cir.1986); *United States v. Accetturo*, 783 F.2d 382 (3d Cir.1986); see also *United States v. Edwards*, 430 A.2d 1321 (D.C.App.1981) (in banc) (upholding preventive detention under District of Columbia bail statute), cert. denied, 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 141 (1982).

This does not, however, end the due process inquiry. Since the Bail Reform Act curtails a defendant's precious interest in liberty, the Due Process Clause requires heightened scrutiny of the statutory means used to affect such curtailment. Under 18 U.S.C. § 3142(e), the judicial officer may order a person confined for dangerousness only after a finding that no conditions of release will assure the safety of the community. Under the statute, detention is meant to be a sparingly dispensed remedy of last resort, used only when needed to protect society in cases where there is proof that less drastic measures would fail. Moreover, appellants do not make any persuasive claim that the statutory procedures required as prerequisites to a finding of dangerousness are unfair or provide insufficient "protection against erroneous and unnecessary deprivations of liberty." *Schall*

*v. Martin*, supra, 467 U.S. at 274, 104 S.Ct. at 2415.

Due process also dictates that the government not pursue its goals through "conduct that shocks the conscience." *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952). It is not necessary to be enthusiastic about comparatively brief pretrial detention of accused persons on the basis of predicted future crimes to acknowledge that the practice does not violate that norm. It may be that such predictions are less than scientific, and that it is difficult to assess whether the verifiable gains in reducing crime justify the curtailment of liberty that results. But that assessment is for the legislature, not for us, to make, so long as there is no constitutional violation. There is nothing inherently shocking to the conscience in using a prediction of future criminality to justify confinement. When a person has been convicted of crime, judges legitimately rely on such predictions in setting the length of a prison sentence. Identical considerations shape the decision whether to grant bail to a convicted person pending appeal. *Carbo v. United States*, 82 S.Ct. 662, 7 L.Ed.2d 769 (Douglas, Circuit Justice, 1962); *United States v. Anderson*, 670 F.2d 328 (D.C.Cir.1982) (per curiam); *United States v. Provenzano*, 605 F.2d 85 (3d Cir.1979). In both situations, a judge's informed assessment of a person's dangerousness may increase the length of time that the person is incarcerated. The law also acknowledges that a person arrested for crime may be summarily detained for a short while before coming before a magistrate not only to prevent flight or danger to the judicial process, but also to bar commission of future crimes. Cf. *Gerstein v. Pugh*, 420 U.S. 103, 114, 95 S.Ct. 854, 863, 43 L.Ed.2d 54 (1975) (once suspect is in custody "there no longer is any danger that suspect will escape or commit further crimes" while police submit evidence to magistrate). If the police may detain an arrestee for a short time to prevent danger to the community pending a

finding of probable cause, Congress may direct judges to do the same after an indictment and pending trial.

There is no doubt, as the majority points out, that putting someone in jail simply because he is thought to be dangerous is not part of our tradition of liberty. But the issue is not as stark or as simple as that. Under the Bail Reform Act, a number of limitations come into play before a person can be confined. First, the person must be charged with a crime, and not just any crime, but a serious crime as specified in the statute. Second, the government must persuade a judicial officer by clear and convincing evidence that the defendant is a danger to the community. Third, the government must also persuade the judicial officer by the same standard of proof that no condition of release will deter the defendant from committing a crime while at liberty. Fourth, the detention is meant to be of limited duration—until it can be determined whether the defendant is guilty of the crime charged. So the constitutional issue before us is not simply whether an individual can be confined because he is dangerous. It is whether a defendant already indicted for a serious crime can be denied bail in the pretrial period because there is clear and convincing evidence that the defendant will otherwise commit another crime while on release. So stated, the proposition still raises grave constitutional issues but the answer to them is not easy. For example, if a member of a terrorist organization is indicted for blowing up an airliner for political reasons and there is clear and persuasive evidence that the defendant will do so again if not confined, it is not self-evident to me that society must nevertheless immediately release him on bail until he is tried.

The majority sees an "anomaly" in holding the Bail Reform Act constitutional because

a person who has been charged with crimes of violence but not yet convicted may be incarcerated on the ground that he will commit crimes of violence in the future, whereas persons who have been neither charged with nor convicted of violent crimes, or have served their sentence of conviction on those charges, may not be incarcerated on the basis of such a prediction.

I see no anomaly. The Bail Reform Act applies only to persons indicted for serious offenses, not to unaccused citizens plucked from the population at large. Indictment basically alters the due process inquiry by establishing probable cause to believe that the accused has committed specific acts constituting a serious crime. That legal finding gives the government a concrete basis, not available as to persons not accused, for predicting that the person will commit another crime before trial.[1] In other contexts, probable cause is also sufficient to permit significant restraints on liberty. See *Gerstein v. Pugh,* supra, 420 U.S. at 118–20, 95 S.Ct. at 865–66 (detention of arrested person pending further proceedings); *Morrissey v. Brewer,* 408 U.S. 471, 485–87, 92 S.Ct. 2593, 2602–03, 33 L.Ed.2d 484 (1972) (detention of parolee pending final decision whether to revoke parole). Moreover, as noted above, the Bail Reform Act has a built-in limit on the length of the period for which an accused person may be detained. The end of that period coincides with the disposition of the underlying criminal charge against the defendant, whether by plea or by trial. While undue pretrial delay may further affect the due process equation, see Part II below, detention under the Bail Reform Act is meant to be limited to preserving the status quo, as far as the community is concerned, pending the resolution of specific legal charges.

For these reasons, I conclude that detaining indicted defendants under the Bail Re-

---

**1.** Also inapposite is the analogy to those who have served sentences for past offenses but have not been again indicted. Double jeopardy considerations apply to them. In addition, a principal rationale for sending convicted offenders to prison is that their sentence will rehabilitate them and deter them from future misconduct. Neither consideration applies to those not yet convicted of a crime.

form Act for a limited time on the basis of clear and convincing evidence that nothing short of confinement will prevent them from violating the law while on release does not violate any norm of decency implicit in the concept of ordered liberty, and does not violate the Due Process Clause.

## II. Does the Statute as Applied Comport with Due Process?

Up to this point, I have considered whether the Bail Reform Act is unconstitutional on its face. The conclusion that it is not does not determine whether the statute as applied comports with due process. The government's powers of preventive detention in a given case are not limitless. Every other appellate court that has examined the lawfulness of this practice under the Bail Reform Act has indicated that pretrial detention to prevent future crimes may be invalid if unduly prolonged. *Portes,* supra, 786 F.2d at 768 & n. 14; *Accetturo,* supra, 783 F.2d at 388; see also *United States v. Theron,* 782 F.2d 1510, 1516 (10th Cir. 1986); cf. *United States v. Edwards,* supra, 430 A.2d at 1333 (stressing 60-day time limit of D.C. preventive detention scheme determined to be constitutional). This reflects widespread agreement that the passage of time can tip the scales of the balance mandated by due process.

To put the proposition another way, even legitimate and compelling objectives cannot justify detaining a person indefinitely before trial. At some point in time, the harsh burdens of extended confinement will exceed the bounds of due process. As I stated in my concurring opinion in *Melendez-Carrion,* at 1006–09, lengthy pretrial incarceration can run afoul of the rule that the government may not punish a person not convicted of crime. *Bell v. Wolfish,* 441 U.S. 520, 535–36, 99 S.Ct. 1861, 1871–73, 60 L.Ed.2d 447 (1979). Whether a measure is punitive in nature depends both on whether the action is imposed for the purpose of punishment and whether it is excessive in relation to the legitimate, nonpunitive aims assigned to it. *Schall,* supra, 467

U.S. at 269, 104 S.Ct. at 2412; *Bell v. Wolfish,* supra, 441 U.S. at 538–39, 99 S.Ct. at 1873–74.

In *Melendez-Carrion,* Judge Newman and I were willing to assume that Congress did not intend preventive detention under the Bail Reform Act to be a punitive measure. However, the second branch of the due process inquiry demands that confinement before trial not be excessive in relation to the statute's goals. Accordingly, undue prolongation of detention before trial can transform what is initially a valid regulatory measure into punishment prohibited by the Due Process Clause. That is so because the traditional test for distinguishing regulatory from penal measures set forth in *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644 (1963), and reaffirmed in *Bell v. Wolfish,* supra, looks to whether a measure "involves an affirmative disability or restraint" and whether "it has historically been regarded as a punishment." Detention before trial undoubtedly imposes a major disability and restraint on the defendant. As I explained in *Melendez-Carrion,* detention for a long period of time founded on a person's danger to the community is also so harsh that it comes to resemble a traditional prison sentence. Since none of the traditionally "regulatory" reasons for jailing a person without trial, such as the defendant's propensity to flee or to tamper with witnesses, justify confinement in such a case, such lengthy detention would historically be seen as a punishment. Accordingly, unduly extended incarceration for general dangerousness of persons never convicted of any crime can cross the line separating a valid regulatory measure from punishment imposed in violation of the Due Process Clause. *Melendez-Carrion,* supra, at 1008–09.

In *Melendez-Carrion,* I took the position that the length of preventive detention requires assessment on a case-by-case basis, since due process does not necessarily set a bright line limit for length of pretrial con-

finement. Here, Salerno and Cafaro have been detained for dangerousness for a little over three months. Arguably, time alone should not always determine whether a given instance of detention for dangerousness has become punitive. Though length of time may be the best measure of the impact of incarceration on a person accused of crime, perhaps due process judgments should take into account the reasons for pretrial delay in unusual circumstances. Relevant factors might include the complexity of pretrial preparations for the underlying case, and whether the defendant or the government has added needlessly to that complexity or has egregiously delayed the proceedings. See *Accetturo,* supra, 783 F.2d at 388. I cannot conclude on this record that the restriction on appellants' liberty has degenerated into punishment. Were we to affirm, I would not foreclose appellants from renewing their constitutional claims at a later date.[2] But at this point, there is no constitutional basis on which to set aside Salerno's and Cafaro's detention. We should affirm. I respectfully dissent.

**2.** Pretrial detention under any circumstances is an extraordinary remedy with serious due process implications. If the government seeks the benefit of that remedy it must exert itself to accelerate the date for a trial. Quite often, reliance on the usual processes of trial administration will not be enough. If this is so, the government must take whatever special steps are needed to move the trial date forward. In complex multi-defendant cases, that may require that the government seek a severance. In cases involving many hours of taped intercepted material, the government may have to arrange for swift and reliable transcription, by extraordinary means if necessary, before moving for detention or immediately after obtaining it. Should the government be unwilling or unable to shoulder the cost of these procedures, pretrial detention may not be available.

The Speedy Trial Act, 18 U.S.C. § 3164, does mandate that cases involving detained persons be given priority. On June 4, the trial judge apparently set a date shortly after October 1, 1986 for submission of pretrial motions in this case. Such a leisurely pace in a criminal case involving pretrial detention is difficult to justify.